STATE OF MINNESOTA, Plaintiff in Error, *vs.* GEORGE W. BATCHELDER, Defendant in Error.

ERROR TO THE DISTRICT COURT OF RICE COUNTY.

In pre-emption cases upon School Lands, arising under the joint resolution of Congress of March 3, 1857, the Land Officers have the right to try the question of settlement prior to the survey of the land, and it being a question of fact subject to contest, their decision upon it is as conclusive as it is upon any other question of fact arising before them.

The effect of the joint resolution of March 3, 1857, was to qualify the act of February 26, 1857 in regard to the School Lands the State was to receive from the United States on its admission into the Union, and render them subject to the claims of settlers who had improved them prior to the surveys. This resolution having been asked for by the Territory, and accepted by the State, cannot now be questioned. It was more a matter of contract between the Federal Government and the Territory and State, than of legislation, and both were competent contracting parties.

A statement of the substance of the complaint and amended answer, and a copy of the reply in this action, will be found in 5 *Minn. Rep. p.* 223 27. In that case, the Defendant demurred to the third, fifth, sixth and seventh grounds of the reply. The demurrer was sustained, and this Court affirmed the judgment thereon. The cause was then remanded to the District Court for further proceedings.

At the May term of said District Court of Rice county, held on the fifth day of May, A. D. 1862, said cause coming on to be heard, a jury was impanneled therein, and for the purposes of this action the Defendant admitted that the Plaintiff was, at the time of the commencement of this ac-

tion, and still is, in the actual possession of the premises in dispute.

And for the purposes of the action, the Plaintiff admitted the purchase by the Defendant, from the pre-emptor, of the land in dispute, the regularity of the appointment of, and proceedings by, the administrator, and the purchase by the Defendant from the administrator, and that deeds were duly executed by said pre-emptor and administrator to the Defendant, as alleged in the answer; all which admissions were made in open Court and entered upon the minutes.

The Plaintiff, for the purpose of proving that by an act of Congress, entitled "An act to authorize the people of Minnesota to form a Constitution and State government preparatory to their admission into the Union, on an equal footing with the original States," approved February 26th, 1857, as modified by a joint resolution of Congress, entitled " a resolution relative to sections sixteen and thirty-six, in the Territories of Minnesota, Kansas, and Nebraska," approved March 3d, 1857, the land in dispute was conveyed and passed by said laws to the Plaintiff, offered to prove that the said lands were not settled upon by the Defendant or his grantors, that no dwelling house was erected and no improvements made thereon prior to the survey thereof by the United States Government.

To this evidence the Defendant objected; the Court sustained the objection and excluded the evidence, and the Plaintiff duly excepted.

After reading the laws to the jury under which the Plaintiff claims, the Plaintiff rested, and Defendant introduced the patent and duplicate certificates described in the answer. Upon the submission of the case to the jury, the Plaintiff requested the Court to charge the jury—

First, That section eighteen of the act of March 3d, 1849, being the organic act of the Territory of Minnesota, constituted a reservation and appropriation of all sections therein described, and that by virtue of such appropriation for public uses, the title passed out of the United States, and remaining in abeyance until the State was admitted, vested in her.

State of Minnesota v. Batchelder.

Second, That such appropriation to public uses, so divested the title from the United States as to render any subsequent grant of the same lands by the United States, to parties other than the State, void.

Third, That the act of Congress of February 26th, 1857, being the act authorizing the formation of a State government by the people of Minnesota, as modified by the joint resolution of Congress of March 3d, 1857, entitled " a resolution relative to sections sixteen and thirty-six, in the Territories of Minnesota, Kansas, and Nebraska," conveyed to the State every section numbered sixteen and thirty-six, excepting those sold or otherwise disposed of before the date of said act of February 26th, and excepting those settled upon prior to the survey; and that this being the true construction of the grant, the Register and Receiver of the land office had no authority or jurisdiction under either of said acts, to determine judicially what lands passed and what did not pass by the grant to the Plaintiff.

Fourth, That the joint resolution of March 3d, 1857, when interpreted in connection with the act authorizing the formation of a State government, must be limited in its operation to those lands only, which had been reserved from sale in the Territories of Minnesota, Kansas and Nebraska, and the States thereafter to be carved out of the same, excluding from its operation all lands which had been offered or granted to Minnesota prior to its passage.

Fifth, That the act of February 26th, 1857, if not at the time of the passage of the joint resolutions, an executed grant, was at least a solemn compact which could not be violated without a gross breach of the national faith, and that an act violating a national executory contract is void upon general principles.

Sixth, That the memorial of the Territorial Legislature, to Congress, passed February 26th, 1856, asking for the passage of the joint resolutions of March 3d, 1857, cannot have the effect of making a Congressional enactment valid, which would otherwise have been void, as the Territorial Legislature possessed no power to cede or dispose of school lands, or to bind the State by assent to their diversion from the purposes for which they were granted.

Each and every of the foregoing propositions the Judge declined and refused to charge, and to such ruling and refusal as to each separate request, the Plaintiff duly excepted.

The jury, under the charge of the Court, found a verdict for the Defendant, and judgment was rendered accordingly; to all of which Plaintiff duly excepted.

Points and Authorities of Plaintiff in Error.

1st. The joint resolution of Congress, of March 3d, 1857, is void, and cannot divest or injuriously affect any title which the State would otherwise have acquired.

2d. If not void, it does not extend and apply to School Lands within the present territorial limits of the State.

3d. Conceding its validity and full application, however, it only professed to affect such lands as had been settled upon prior to the survey, and conferred no jurisdiction upon the land officers to determine judicially as against the State, what lands had been so settled, or to convey or dispose of any lands not within its purview; and any such jurisdiction attempted by such officers, may be collaterally assailed in any court, where rights under their authority are claimed.

I.—Is the joint resolution of March third, void?

It is a principle of public law too well settled to be controverted now, that a reservation or dedication of land to public uses, whether by the sovereign or a private individual, divests the title of the party making such reservation, and withdraws from him all power over the subject matter, although there may be no grantee *in esse* capable of taking under the grant.

By section 18 of the act of Congress of March third, 1849, known as the organic act of the territory, it is enacted "That when the lands in said territory shall be surveyed, sections 16 and 36 shall be, *and the same are*, reserved for the purpose of being applied to schools," &c.

By virtue of this act alone, the State would have acquired a title to the sections designated. Section 12, of the act of March third, 1809, containing a similar reservation, received a judicial construction in the case of *Gaines vs. Nicholson*, 9 *How.*, 174; the court holding that the State acquired a right to every sixteenth section, the title to which became vested,

if vested at all, as soon as the surveys were made, and the sections designated.

Prior to the existence of the State, this clause operated simply as a dedication to a public use. The fee passed out of the Government and remained in abeyance until the creation of the State. The citizens of the territory were the beneficiaries of the charity, for its execution under the laws the title would vest in the State, upon its creation. *Trustees of Vincennes University vs. State of Indiana*, 14 *How.*, 268; 20 *Curtis*, 172. This being the true construction of the law, can Congress divest any portion of the fund thus created from the beneficent objects to which it has been dedicated, and vest a valid title in a purchaser?

Under the English Constitution, this would not have been within the arbitrary power of the crown, *a fortiori*, it cannot exist under the more limited power of our American Government. *The Town of Pawlet vs. Clark*, 9 *Cranch*, 392, (2 *Curtis*, 358); *New Orleans vs. United States*, 10 *Peters*, 662, (12 *Curtis*, 292;) *The City of Cincinnati vs. White's Lessee*, 6 *Peters*, 431, (10 *Curtis*, 179.)

We have shown by authorities of the highest consideration, then, that unless there exist some exception which can operate to withdraw the case at bar from the general rule governing all reservations for public purposes, it was not competent for Congress to divert the premises in dispute from the purposes to which they had been dedicated.

But two possible answers occur to us.

1st. It may be said that the language of the act of March third, 1849, "That when the lands in said territory shall be surveyed," postpones the operations of the reservation until the survey, and that parties locating thereon, previous to that time, under the sanction of the government, acquired equities prior to, and which take precedence to the rights of the public.

The language of the act, " Shall be *and the same are hereby reserved,*" repels this inference, the latter clause being entirely unnecessary and superfluous, unless it were the intention of Congress to make a *present reservation* of certain sections, the words " when the lands shall be surveyed " merely referring to the period when the sections so reserved should become

capable of definite description by the survey. The cases of *Gaines vs. Nicolson*, and *Trustees of Vincennes University vs. State of Indiana*, cited *ante*, sustain this construction.

But it is not true that persons settling upon lands prior to the survey, were encouraged to do so by the expectation of retaining their claim, should it happen to fall upon lands reserved for school purposes. On the contrary, the uniform policy of the government had been to allow the settler so situated to settle other lands in lieu of those thus appropriated; and the joint resolutions of March third, 1857, were the first intimation of a change of policy. At the time of the passage of the act of August fourth, 1854, extending the right of pre-emption over unsurveyed lands in Minnesota, two acts were in existence; viz: the act of June first, 1840, and the act of March third, 1843, expressly declaring the right of the settler, not to retain the claim, but to select other lands in lieu of those thus taken. Every settler upon unsurveyed lands, therefore, voluntarily makes his claim subject to this contingency.

2d. It will be urged on the part of the Defendant that the joint resolution of March third, 1857, was passed at the express solicitation and request of the Legislature of the Territory of Minnesota.

It is true that on the twenty-sixth of February, A. D. 1856, in a time of extreme speculative excitement, a Legislature which appears to have been fruitful in memorials, did make a request of this character. See *page* 368, *Laws of* 1856.

The powers of the Territorial Legislature are derived from the act of March third, 1849, which nowhere confers, either expressly or by implication any power upon them to legislate in any manner, respecting the school lands within the Territorial limits. On the other hand, the language of section 18 indicates an intention to consecrate these lands for the benefit of the generations who should in future inhabit the State, and divesting Congress of all power of disposition over them, to withhold them from any other body then in existence. They are reserved "for the purpose of being applied to schools in said Territory, *and in the State and Territories hereafter to be erected, out of* the same." They were not granted to the

Territory, and were in no sense its property.    It was a dedi-
cation to a public purpose, the title, as we have seen, remaining
in abeyance, and no intention is manifest or can be reasonably
inferred, to make the territorial legislature the trustees of the
charity.    This conclusion, which is irresistible from the act
itself, is farther strengthened and confirmed by the act of
February 19th, 1851, conferring upon the Governor and Leg-
islature the power to make laws and needful regulations .to
protect sections 16 and 36 from injury and waste. 9 *Stat.*, 558.

Had a general power and control over these lands been
vested in them, extending to the absolute right of disposal, it
would have included the minor and incidental power of pro-
tection. The fact that Congress deemed it necessary to confer
this limited power upon the Legislature, conclusively proves
that no power vested in them in the absence of express en-
actment, and then, only so far as conferred by the terms of
the act.    By referring to the Constitution of the State it will
be seen that the people have deemed it necessary to impose
the most cautious restrictions upon their legislatures, with re-
ference to these lands, and have incorporated into the funda-
mental law the time honored maxim of the government, viz :
that the lands granted for the use of schools in this State shall
remain a perpetual school fund.    In view of these facts, it
would be folly to suppose that Congress should have so aban-
doned and ignored a principle so often and so ably announced
from her judicial tribunals, as to have exposed an interest of
this importance to the mercy of a reckless territorial legisla-
ture, untrammeled by constitutional restrictions.

We have seen, in the review of the case of *Pawlet against
Clark*, cited *ante*, that after a dedication has been made to
public uses, no grantee being *in esse*, it can only be aliened
by the assent of the beneficiaries, viz : in this instance, the
people of the State.    It was there held that after the erection
of a church the assent of the patron  (that is, the crown), the
parson (in whom the title was vested), and the parishioners
(the beneficiaries), must concur to give validity to a subse-
quent grant.    The parson, although holding the fee, could not
bind the parishioners by his assent.    Here the people did not,
and could not confer such power upon their legislature, the

powers of that body being only such as were conferred by the organic act, which did not emanate from the people, and from which alone they derived their legal existence.

These views, deduced from precedent, principle, and the uniform policy of the Government, seem conclusive upon this point. This brings us to the second branch of the case, viz :

II.—If not void, the joint resolution of March third does not extend and apply to school lands within the present territorial limits of the State.

On the 26th of February, 1857, in the act authorizing a State government, Congress entered into a solemn compact with the people of the State, whereby every section numbered sixteen and thirty-six, within her borders, as defined by that act, not previously disposed of, were offered to the State with the implied condition that she was to have until the assembling of her convention, under the act, to accept or reject the proposition embraced by such offer; and this, indeed, was expressly stipulated in the agreement, that if accepted the propositions should be obligatory on the United States.

This act was simply a continuance of the policy adopted by the United States in its dealings with Minnesota in the act of March third, 1849, and its sole object was to vest that title which had before remained in abeyance for want of a grantee *in esse* in the State, as executor of the trust. That it had the effect of a present grant, will be seen by a reference to the decision of the Secretary of the Interior, under date of September 10, 1857, upon the enabling act of Michigan, published on *page* 494 *of Lester's Land Laws. Also, Cooper vs. Roberts*, 18 *How.*, 173; *Ham vs. State of Missouri*, 18 *How.*, 126.

It will be urged, however, by the Defendant that the act of February 26th, did not profess to offer or to convey to the State any lands except such as should remain undisposed of at the acceptance of those propositions by the State.

This proposition is unsupported by the language employed. After granting sections 16 and 36, it proceeds: " And when either of said sections or any part thereof *has been* sold or otherwise disposed of, other lands, &c., shall be granted. The term " has been " has reference to the date of the passage of

the act. Had the date of acceptance been the time referred to, the words " shall have been " would have been used. On acceptance, therefore, a title vested in the State to all lands embraced by the grant, not disposed of on the 26th of February, from which time the conveyance took effect by relation. That the words " shall be granted " are apt words to denote a present grant,—See *Rutherford vs. Greenes' heirs*, 2 *Wheaton* 196, (4 *Curtis*, 73.)

For our present purpose it will be sufficient to treat it as an offer to the State, without consideration, and not binding as an executed grant, until its acceptance.

On March third, 1857, only a week afterwards, and while this solemn agreement was fresh in the memory of every member, the joint resolution was adopted containing not the most remote reference to the grant and compact of the previous week. Had it been intended to have thus vitally affected that grant, can it for a moment be supposed that an allusion to, and express modification of, its terms by an amendatory enactment or in the resolutions themselves, would have been omitted? It is a principle of law that repeals by implication are disfavored and are never to be presumed ; that unless the two enactments are utterly and absolutely unreconcilable, the one with the other, both will be allowed to stand; *a fortiori*, then should this rule apply in its full force to a case in which the result of a different construction would imply a gross violation of the plighted faith of the nation. But the joint resolution will admit of a different construction which will give full force and effect to every clause; and leave the act of February 26th intact.

The resolutions declare, " that whenever any settlements, &c., shall have been or shall be made upon sections 16 and 36, which sections have been reserved for the support of schools in the Territories of Minnesota, Kansas and Nebraska, and in the States and Territories *hereafter to be erected* out of the same, then &c."

Reading this law in connection with the act of February 26th, and acting upon the presumption that in the absence of express language the repeal or modification of the latter was not intended, the construction will depend upon the meaning of the term *erected*, as used in the joint resolution.

The people of the State derive the sole power to organize a State government from Congress. In this act are defined the limits of the future State and the restrictions under which she is to be admitted into the Union. The acts of the Convention and the subsequent act of Congress, formally admitting her, all derive their force and have relation to the act authorizing the formation of a State government.

The State of Minnesota was, we apprehend, erected within the meaning of the word as here used, prior to the passage of the joint resolution; certainly the work of erection had commenced. The acts of the convention cannot be said to constitute the erection, for they, without the authority and assent of Congress would be nullities. The act formally admitting the State is not an erection ;. it is a mere formal recognition of the regularity and validity of the prior proceedings. If any step in the proceedings, more than another, can be so regarded, it is the act of Congress separating a portion of the Territory of Minnesota from the remainder, and designating it as the future State, subject to the assent of its inhabitants. The boundaries and name were thus fixed one week prior to the passage of the joint resolution of March third, 1857. With this construction, the resolution will have full application to that part of the Territory of Minnesota, not included within the limits which Congress had marked out and entitled the State of Minnesota, and to the Territories of Kansas and Nebraska. We regard this construction as the most reasonable ; but if it were doubtful, the fact of the passage of the resolution so recently after the act of February 26th, with no allusion to the latter and the presumption that Congress having made an offer to the people of the State, and given them a certain period within which to accept or reject it, would not, before an opportunity had been afforded to the State to signify her acceptance, withdraw or materially change it, are sufficient to enforce the construction which we urge.

We are not, however, without authority in support of our position. *Wilcox vs. Jackson*, 13 *Peters*; 498, (13 *Curtis*, 266.)

We have now arrived at the third and last point upon which we rest our case.

III.—Conceding the validity and application of the joint resolution, it only professes to affect such lands as had been

settled upon prior to the survey, and conferred no jurisdiction upon the Register and Receiver of the land office to determine judicially as against the State, what lands had been so settled, or to convey or dispose of any lands not within its purview, and any such jurisdiction attempted by such officers, may be collaterally assailed in any court where rights under their authority are claimed.

It may be said that this question was determined by the court, when the case was before it on a former occasion. It is true the question incidentally arose, but was slightly considered by the Court, the question of fraud and sufficiency of the pleadings upon that point being the main point, and the only one foreclosed by that decision. The question we now raise is properly before the Court, and we respectfully ask for it a careful examination and adjudication. *Elliot vs. Piersol*, 1 *Peters*, 328, (7 *Curtis*, 601); *Rose vs. Himely*, 4 *Cranch*, 241, (2 *Curtis*, 87); *Williamson vs. Berry*, 8 *How.*, 495, (17 *Curtis*, 669); *Latham vs. Edgerton*, 9 *Cow.*, 227; *Rogers vs. Dill*, 6 *Hill*, 451; *Grignons Lessees vs. Astor*, 2 *How.*, 319, (15 *Curtis*, 125); *Thompson vs. Tolmie*, 2 *Peters*, 157, (8 *Curtis*, 62); 13 *Peters*, 498; *Res.* 12, *p.* 664. *U. S. Statutes at large*, 1856-57; *Comegys vs. Vasse*, 1 *Peters*, 193, (7 *Curtis*, 529); *Doe vs. Eslava*, 9 *How.*, 421, (18 *Curtis*, 208); *Stoddard vs. Chambers*, 2 *How.*, 284, (15 *Curtis*, 119); *Lodiga vs. Rowland*, 2 *How.*, 681, (15 *Curtis*, 211); *Brush vs. Ware*, 15 *Peters*, 93, (14. *Curtis*, 34); *Wilcox vs. Jackson*, 13 *Peters*, 498, (13 *Curtis*, 266); *Stevens vs. McCargo*, 9 *Wheat.*, 502, (6 *Curtis*, 153); *Polk's Lessees vs. Wendal*, 9 *Cranch*, 87, (3 *Curtis*, 276,) reaffirmed in same case, 5 *Wheat.*, 293, (4 *Curtis*, 632); *Gaines vs. Nicolson*, 9 *How.*, 356, (18 *Curtis*, 174); *Cunningham vs. Ashley*, 14 *How.*, 377, (20 *Curtis*, 233).

In conclusion, it is only necessary to say that the authorities seem to establish,—

1st, That the land officers were not acting in a judicial capacity in allowing pre-emptions upon the land in dispute, but except as to the proof required by the pre-emption law, their powers were purely ministerial.

2d, That if they can be regarded as a judicial tribunal, their powers being only statutory and extremely limited, the

authorities most favorable to the Defendant sustain a full inquiry into, and impeachment of, their jurisdiction; and

3d, This inquiry discloses the fact that these lands, not being settled upon prior to the survey, were not in a state subjecting them to the jurisdiction of the land officers.

Points and Authorities for Defendant in Error.

I.—The Court below committed no error in denying the offer of the Plaintiff to prove that there was no settlement, improvement or dwelling house on the land, prior to the survey of the United States; because,

1st. There is no allegation in the pleadings such as would authorize the introduction of such evidence.

2d. The adjudication and pre-emption at the proper land office, the duplicate and patent which are alleged in the answer and not controverted by the reply, are, in the absence of fraud, conclusive, and could not be controverted or called in question by the Plaintiff at the trial.

3d. If such evidence was admissible at all, it was only admissible as rebutting; the Court was not bound to receive it, and it would have been bad practice to receive it until after the Defendant had closed his testimony under his answer.

II.—It was not error in the Court to withhold from the jury the instructions requested to be given by the counsel for the Plaintiff; because,

1st. The points raised by the requested instructions were not in issue by the pleadings in the case.

2d. Because the right of Defendant's grantors to pre-empt the land in dispute, had already been passed upon by a competent tribunal, and the judgment in the premises duly pleaded in the answer and not controverted by the reply.

3d. Because said instructions are not in accordance with the law applicable to the case.

III.—The complaint sets forth possession; the answer sets forth a title to the land, under and by virtue of a pre-emption duly made, and allowed by the Register and Receiver of the proper land office, on the 15th day of August, A. D. 1857, (and the same is proved on the trial by the introduction of

State of Minnesota y. Batchelder.

the duplicate and patent.) The reply contains no denial of, these allegations of the answer, except by alleging that the land was granted to the Plaintiff by act of Congress, February 26, 1857. Then the question to be determined is, which party has shown the better title, or rather, is there such proof of title in the State as to entitle it to a judgment for the relief sought.

IV.—The Plaintiff is not in a position, under his pleadings, to claim title under the reservation in the organic act, or any act or grant except that of February 26th, 1857.

The allegation in the reply is, " On the 26th day of February, 1857, the United States then being lawfully possessed, as owner in fee simple of said land, by an act of Congress approved on that day, duly granted and conveyed said land to the Plaintiff," &c. ·

The language employed in the organic act, viz: " Sections 16 and 36 shall be and the same are hereby reserved for the purpose of being applied to schools," &c., does not in any respect resemble a grant or dedication, nor does it place those lands beyond the control of the government. It is a mere reservation—does not provide in what manner they shall be applied to schools, or to what kind or class of schools, nor whether such application shall be under the direction of Congress or the Legislature of Minnesota. ·*Lester's Land Laws*, 498-99, (*construction given by Commissioner and Sec'y of Interior*;) *Vincennes University vs. State of Indiana*, 14 *How.*, 263, (20 *Curtis* 172), *opinion of Taney.*

Such a provision has never been regarded by Congress or the States or Territories for whose benefit such reservations have been made, or by the Courts, as a grant or contract binding on the United States, or as placing their lands beyond the control and protection of Congress. Congress has invariably passed other acts, in addition to such a reservation, expressly providing for the protection of, and granting the lands to the State for which they were reserved, the same as has been done for Minnesota. *Gaines vs. Nicolson*, 9 *How.*, 356, (18 *Curtis* 174); *Vincennes University vs. State of Indiana*, cited above; *Organic Act of Feb.* 19, 1851, (*Lester's Land*

*Laws*, 173,); *Enabling Act and Joint Resolutions of March 3, 1857*.

But if the reservation contained in the Organic Act had placed the lands in question beyond the control of Congress by putting the title in abeyance, as claimed by the Plaintiff, the people of Minnesota being the beneficiaries of that act, by their memorial passed by their Legislature, February 26, 1856, would have surrendered and forfeited all right to the same, and Congress would have full power with the consent and at the request of the people of Minnesota, through their Legislature, to provide for and authorize the pre-emption of the land. *See (Memorial) Sess. Laws*, 1856, *p. 368*.

The people of the Territory of Minnesota whose Legislature passed this Memorial, were the real beneficiaries of the reservation, were empowered by their organic act with full legislative authority, and their laws and contracts were all recognized and continued in force by the people of the State of Minnesota at the time the State Constitution was formed. *See Organic Act, section 6, and State Constitution Schedule, sections 1 and 2*.

V.—The Enabling Act of February 26, 1857, does not purport to be an immediate grant, but simply an offer on certain conditions; and it has been construed by this Court as not amounting to an absolute grant, till after the acceptation by the Constitutional Convention, August 29, 1857, and the subsequent adoption of the State Constitution by the people, on the 13th of October, 1857; that prior to that time it was only conditional, and subject to such modification as Congress saw fit. *5 Minnesota Reports*, 232 *and* 239, *State vs. Batchelder*.

Such modification, by the joint resolution of March 3, 1857, imposes no contract and disturbs no vested right. It was engrafted upon the pre-emption law of September 4, 1841, enlarges its provisions and extends the area to which it is applicable, and must be interpreted in connection with and as forming a part of said pre-emption law, and also as having particular reference to the wants of the community at whose immediate request it was passed, and so modifying the offer first made to the Constitutional Convention. *Lester's Land*

*Laws*, 238, (*amendment to same;*) *do.* 285, (*Joint Res. March 3, 1857;*) *Bouvier's Law Dictionary, Vol.* 2, 259, *title "Offer," definitions 3 and 4; McCullough vs. Eagle Insurance Company,* 1 *Pickering*, 277; *Mortier vs. Frith,* 6 *Wendell,* 103.

The joint resolution of March 3, 1857, by employing the very language used in the organic act, to reserve sections sixteen and thirty-six for the use of schools in Minnesota, to designate the lands to which that reservation was to apply, settles the question whether it applies to the territory now embraced in the State of Minnesota, to say nothing of the occasion of these resolutions being passed, and the construction uniformly given to it by all the departments of the United States and the State of Minnesota.

As to the jurisdiction of the land offices. This was one of the issues joined by the demurrer and was expressly settled by this Court, at the last July term. Their want of jurisdiction is not pleaded by the Plaintiff, and if it had been pleaded, the Defendant has only to cite the decision of this Court, in addition to the authorities cited and read on the trial of the demurrer. 5 *Minn. Rep.*, 245, *State vs. Batchelder*; *See Pre emption · Law, Memorial and Joint Resolution cited above.*

Gordon E. Cole, Attorney General.

Batchelder & Buckham, Attorneys for Defendant in Error.

*By the Court*—Flandrau, J.—This case came before us on demurrer to the third, fifth, sixth and seventh grounds of the reply, the demurrer alleging the insufficiency thereof as a reply to the Defendant's answer. We held the demurrer well taken. Our decision on that question is reported in 5 *Minn. R.*, 223. The main points decided in that case were—

1st. That the land officers had the right and jurisdiction to determine whether the lands had been settled upon prior to the survey. That this question was necessarily committed to them, because the lands being in section thirty-six, they had no right to hear any proof looking to a pre-emption of any part of such section, until they had first settled the question

of settlement prior to the survey. That as this question was one of fact solely, depending upon proof for its solution, and subject to contest, their decision upon it was as final and conclusive as it would be upon any other question of fact that properly arose before them.

2d. That if they were imposed upon by fraudulent practices, and their decision thus improperly obtained, a court of equity would, on a proper showing, set it aside. We were not clearly satisfied, however, that the mere admission of false testimony would be sufficient evidence of fraud for this purpose, because the right of cross examination, and impeachment of witnesses, is generally regarded as sufficient protection against fraud of this character We inclined to the opinion that it would not be sufficient.

3d. That it did not appear that the State was not a party to the proceedings before the land office, nor that it was left in ignorance of the proceedings until too late to seek redress in that tribunal, both of which facts we thought the pleadings should negative in order to give jurisdiction to a court of equity in an application to vacate a patent granted upon a judicial decision.

The case was left, after the decision of the demurrer, standing upon the first, second, fourth and eighth clauses in the reply. The issue, and the only issue raised was, that the United States was not the owner of the land at the date of the pre-emption made by Lewis and John N. Mills, but had previously and on the 26th day of February, 1857, conveyed it to the Plaintiff. Upon this issue the cause was tried in the Court below. The Plaintiff offered to prove that no settlement or improvements had been made upon the land prior to the surveys, in order to show that the title had passed to the Plaintiff, by virtue of the act of Congress of February 26, 1857, authorizing the people of Minnesota to form a Constitution and State Government, as modified by the joint resolution of Congress of March 3, 1857. This evidence was ruled out by the Court, and such ruling coincides with our views, expressed in the case decided upon the demurrer. As there was no issue of fraud in the case then on trial, it could only have been admissible on the ground that the fact sought

to be proved was open to inquiry at any time, and this is the position claimed by the Plaintiff.

The condition of the title to this land as we understand it, at the time of the pre emption, was this, without reference to the Indian title, which was not extinguished until February, 1853. On the 3d day of March, 1849, the Congress of the United States, by act, organized the Territory of Minnesota. A Legislature was created with powers comprehending all rightful subjects of legislation, consistent with the Constitution of the United States and the provisions of the organic act, which latter act contained some restrictions unnecessary to enumerate, save, perhaps, the one which prevented any interference with the primary disposal of the soil, (*section six.*) By *section eighteen* it was provided that "when the lands in said Territory shall be surveyed under the direction of the government of the United States, preparatory to bringing the same into market, sections sixteen and thirty-six in each township in said Territory shall be and the same are hereby reserved for the purpose of being applied to schools in said Territory, and in the States and Territories hereafter to be erected out of the same."

The counsel for the Plaintiff insists that this was a dedication of these lands to public uses, irrevocable unless with the consent of the beneficiary. Conceding such to be the effect of the act, who was the beneficiary? The lands were to be "applied to schools in said Territory, and in the States and Territories hereafter to be erected out of the same." The question arose in the Territorial Legislature, in the year 1855, I think, whether that body could lease or sell the lands to raise a revenue for school purposes. The question being involved in doubt, was submitted to the Supreme Court, our predecessors, under an act authorizing the Legislature to resolve their doubts in that way. *Comp. Stat.* 121, *p.* 15. The decision was, that the title was in the United States, and not subject to disposal in any way by the Territory. It, therefore, required further Congressional legislation to make the lands available presently for the schools in the Territory. We think the Territory was, nevertheless, the beneficiary of the grant or trust, although its possession was postponed.

When the surveys began to extend over the Territory, it was discovered that in many instances, settlements made in good faith, under the act of August 4, 1854, (10 *Stats. at large, U. S., page* 576) allowing settlements on unsurveyed lands, were upon the school sections, and would prove a loss to the parties if relief was not obtained from Congress. The Terri-.tory, through its Legislature, on the 26th day of February, 1856, requested Congress to permit such settlers to pre-empt their lands, and allow the counties in which such cases occurred to select other lands in lieu of those so entered. *Laws* 1856, *p.* 368.

This act was a full consent that the change might be made by the only party then in being in any manner interested. States and Territories in such matters speak through their legislatures; the assent of the people in their primary capacity was not at all necessary.

On the 26th day of February, 1857, Congress passed an act authorizing Minnesota to form a State government; by this act several propositions were submitted to the people for their free acceptance or rejection; the first of which was "that sections numbered sixteen and thirty-six in every township of public lands in said State, and where either of said sections, or any part thereof, has been sold or otherwise disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to said State for the use of schools." *Sub.* 1 *of sec.* 5.

Within a few days after the passage of this act, and on the third day of March, 1857, Congress, by joint resolution, and evidently in response to and compliance with the memorial of our legislature above referred to, provided " that when any settlement, by the erection of a dwelling house or the cultivation of any portion of the land prior to the survey, shall have been made upon sections 16 and 36, which have been reserved by law, &c., then other lands shall be selected by the proper authorities; and if such settler can bring himself within the act of September 4, 1841, then the right of preference in the purchase of sections 16 and 36, granted by the pre-emption law, shall be in lieu, as if such sections had not been reserved." In regard to the effect of this resolution, we held in

State of Minnesota v. Batchelder.

this case when upon demurrer, that "the State took the grant of these school sections encumbered by the claims of such parties as had made settlements upon them prior to the survey, and could bring themselves within the resolution, and the pre-emption act." 5 *Minn. R.*, 240. It certainly had the effect, if valid at all, of qualifying the proposition to grant the whole sections regardless of such settlements, which was at first made. The people through their convention had the most undoubted right to reject the whole offer, but having asked for the modification, obtained and accepted it. I confess myself unable to discover the principle which permits them to question it. The whole transaction was between perfectly competent contracting parties, and even if, as is contended, the title was put in abeyance by the organic act, beyond the power of Congress to interfere with it, such result would only be in consequence of the Territory and future State having rights under the grant or dedication. These rights they could relinquish, and the voluntary surrender of them by both would remove the restraint at once. The State could have surrendered the whole of the school lands, and been admitted into the Union quite as regularly without as with them.

If there was any lack of power in the Territorial legislature to speak for the Territory in asking this change to be made, or in the constitutional convention in accepting the school lands thus incumbered, it was certainly cured by the ratification of the constitution, by the people, on the 13th of October, 1857, We think there is no question about the validity of the joint resolution, or its effect upon the school lands of the State being as we have decided.

In accordance with the above views the refusal of the Judge to charge the jury as requested by the Plaintiff was correct, and the judgment must be affirmed.

NOTE.—At the opening of this case, all the Judges announced that they were more or less the owners of lands that had been pre-empted by virtue of settlements made on school lands prior to the surveys, and were consequently indirectly interested in the decision of the case. The counsel on both sides desired them to sit in the case, and as it was of much importance to the State and the public that a final decision by the Supreme Court of the United States should be had on the question, and as it could not be taken to that Court without a decision in this, the Judges consented to hear and decide it.